UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

South Nassau Building Corp.,

                    Plaintiff,

          – against –

Town Board of the Town of Hempstead
and Town of Hempstead Landmarks
Preservation Commission,

                    Defendants.

**MEMORANDUM & ORDER**

21-cv-00715 (ERK) (AYS)

KORMAN, *J*.:

A two-story, single-family house (the "House") stands at 3171 Elm Place, on the corner of Jones Avenue, in the hamlet of Wantagh (population: 18,613)[1] in the Town of Hempstead, New York (the "Town"). The House was built in 1925 in the Colonial Revival style of architecture. By all accounts, it is an attractive home. But the House's attractive appearance is not the issue in this case, which challenges the House's designation as a landmark. Rather, the question here is whether the plaintiff's allegations and other record materials plausibly suggest that the defendants improperly interfered with its rights with respect to the House and the

---

[1] *See* Wantagh CDP, U.S. Census, https://www.census.gov/quickfacts/fact/ta ble/wantaghcdpnewyork/POP010220#POP010220.

property upon which it stands. Answering that question in the plaintiff's favor does not entitle the plaintiff to relief. Rather, it merely permits further proceedings at which the plaintiff will ultimately bear the burden to demonstrate the merit of its claims.

Against this backdrop, I proceed to discuss the allegations in the complaint. Plaintiff South Nassau Building Corp. purchased the property at 3171 Elm Place (the "Property") in March 2020 for about $1,000,000. ECF No. 1 ¶¶ 28, 32 ("Compl."). Four months later, on July 30, 2020, "[p]laintiff filed an application with the Nassau County Planning Commission [("Planning Commission")] for minor subdivision approval, seeking to subdivide the Property into two lots" in order to build two houses. *Id.* ¶ 33. The application was necessitated by the Town's zoning ordinance, which apparently permits one lot to be used for only one "[s]ingle-family detached dwelling." Hempstead, N.Y., Building Zone Ordinance § 16. Plaintiff expected to sell the two new homes for approximately $1,325,000 each, resulting in a net profit of approximately $600,000. Compl. ¶¶ 87–88.[2] As part of its subdivision application, plaintiff submitted a letter from the Town's Chief Building Plan Examiner, dated April 13, 2020, certifying that plaintiff's "proposed subdivision is in compliance

---

[2] Selling two homes for $1,325,000 would yield $2,650,000. Because plaintiff purchased the Property for $1,000,000, the expected profit of $600,000, rather than $1,650,000, presumably accounts for costs associated with the demolition of the existing house and construction of the new houses.

with the requirements of the Town of Hempstead Building Zone Ordinance." *Id.* ¶ 34 (internal quotation marks omitted). On August 13, 2020, the Planning Commission heard plaintiff's application at its public meeting and opened a public comment period on the application for subdivision. *Id.* ¶ 36.

While plaintiff's application was pending, Joan Kemnitzer, a neighbor of the Property, applied to the Town's Landmarks Preservation Commission ("Landmarks Commission") requesting that the House be designated a landmark. Compl. ¶ 45; ECF No. 20-5 at 7–12. Pursuant to the Town's code (the "Town Code"), a landmark is "[a]ny place, structure or building of historical value or aesthetic interest by reason of its antiquity or uniqueness of architectural design or as part of the development, heritage or cultural characteristics of the town, county, state or nation." Hempstead, N.Y., Code § 76-1. Any structure or building so designated may not be moved or demolished, nor may its exterior be altered or repaired, without prior approval of the Landmarks Commission. *See id.* §§ 76-10, 76-11.

On September 17, 2020, the Planning Commission passed a resolution approving plaintiff's subdivision application. ECF No. 9 at 3–5. The resolution noted that an application for landmark designation for the House had been submitted. *Id.* at 4. This had allegedly prompted the Planning Commission to "investigate[] the Property's potential for designation as a historical landmark and determine[] that the Property [did not] present any evidence of any historical or architectural significance

3

to warrant preservation and designation as a historic landmark." Compl. ¶ 43. Indeed, Planning Commission officials told *Newsday* that the House "was deemed ineligible for the New York State registry of historical places." John Asbury, *Neighbors Want to Save 1925 Colonial Revival Home in Wantagh*, Newsday (August 16, 2020), https://www.newsday.com/long-island/nassau/wantagh-house-colonial-revival-demolish-w77552 ("*Newsday* Article"); *see* Compl. ¶¶ 38–39 (discussing the *Newsday* Article).

In addition, Bob Meagher, the vice president of the Wantagh Preservation Society ("Preservation Society"), "which typically preserves homes that are 200 to 300 years old," told *Newsday*, "We don't believe [the House] has any historical value," although "[i]t's a beautiful home." *Newsday* Article; *see* Compl. ¶ 39. Similarly, Thomas Watson, the president of the Preservation Society, would later explain that, although "the Society was aware of the house," ECF No. 32 at 1, "when the residents first contacted the Wantagh Preservation Society[,] . . . [he] and many of the Trustees were not aware of the historical significance of the house and [he] really didn't even know what . . . the Colonial Revival [style] . . . was," ECF No. 20-7 at 84.

Unwilling to accept defeat, Kemnitzer continued to press her application before the Landmarks Commission. In advance of the October 2020 hearing before the Landmarks Commission, Kemnitzer, along with Patricia Emanuel and Heather

Famiglietti, two other neighbors of the Property, submitted a report about the architecture and history of the House. ECF No. 20-5 at 2, 34–59. In attempting to demonstrate the House's "uniqueness," Hempstead, N.Y., Code § 76-1, the report contended that the House "is a perfect example of English Colonial Revival Architecture" from the 1910-1930 time period "and is the only one as far as we know in Wantagh." ECF No. 20-5 at 36. Yet the applicants' own expert, Paul Daley, wrote that the "Colonial Revival style" "flourish[ed]" from the turn of the twentieth century "until the late 1940s," so much so that it was featured in an "influential" "advertisement campaign started by the White Pine Lumber Bureau in 1915" through which "booklets were distributed to architects and builders at lumber yards across America." ECF No. 20-8 at 125. "Sears, Montgomery Ward and others" even marketed "[h]ouse kits" that "offered many homes in the Colonial Revival style." *Id.* Unsurprisingly, then, "revival styled homes [still] remain on both Elm Place and Jones Avenue." *Id.* at 127. All this lends significant plausibility to plaintiff's allegation that such homes "are common and may be observed . . . in and around the Town and throughout Long Island." Compl. ¶ 50.

The applicants' report also explained the history of the occupants of the House—the Van Tuyl family, the Verity family, and the Motschwiller family. ECF No. 20-5 at 38–59, 83–88. According to the report, W. Harold Van Tuyl built the House and helped found a lumber yard, which "supplied the lumber for most of the

homes that stand in Wantagh today." *Id.* at 38. Van Tuyl was also a pilot in the Naval Air Force during World War I. *Id.* His son similarly served in World War II and gave his life for our country. The Van Tuyls owned the House for thirty-one years, before they sold it in 1956 to the Veritys, who founded a local barber shop. *Id.* at 49. Eleven years later, the Veritys sold the House to the Motschwiller family, operators of the Wantagh Auto Body, "one of the oldest businesses in Wantagh." *Id.* at 54. This family owned the House for over fifty years, from 1967 to 2020, when they sold it to plaintiff. As the Town Board of the Town of Hempstead (the "Town Board") would later learn from testimony at its public hearing, however, the Motschwillers sold the House with the full "aware[ness]" and "understanding" that plaintiff would "most likely knock the house down to build two, new homes," which increased the purchase price. ECF No. 20-11 at 36–37. Moreover, the relevant landmark laws do not appear to permit the Town to force a homeowner to install a plaque that would describe the home's landmark status and significance to a passerby.

In the hearings it held, the Landmarks Commission heard testimony and took evidence from parties opposing and supporting landmark designation. By the time of the hearings, the Preservation Society had decided to support a landmark designation. But while "[t]he Society helped a group of Wantagh residents navigate the process for landmarking[,] . . . it was the residents who did the heavy lifting." ECF No. 32 at 1. The applicants also noted that they circulated a petition to "save

the house," but that petition received fewer than 300 signatures. ECF No. 20-7 at 71–72.

As indicated above, the applicants submitted a report from Paul Daley, an architectural historian. ECF No. 20-8 at 118–27. Plaintiff submitted a letter from architect Robert Ferraro, who opined that the Property did not merit landmark status. ECF No. 20-7 at 25–27. Ferraro wrote that the House "does not have any visible architectural details" because it had undergone a number of alterations that "negat[ed] any preservation value." *Id.* at 26. These included: "aluminum and vinyl trim and siding" that "covered over" any previously "visible architectural details;" "an aluminum storm door, not in keeping with its era[, which] was installed at the flat roof exterior door location;" the "architectural asphalt shingle" design of the roof; "vinyl sid[ing] with imitation shake shingles;" "windows [that were] replaced with Anderson Vinyl clad double hung windows with snap in grills;" "vinyl or plastic" "outside shutters;" "imitation aluminum" "vertically fluted columns;" and a "Greenhouse addition added (in 1988) to the front of the House." *Id.* All in all, Ferraro explained, the House was "no different than hundreds and hundreds of similar homes on Long Island." *Id.*

Daley conceded that the House had the features that Ferraro described and did not contest that these alterations diminished the House's historical value to some extent. Indeed, he acknowledged that the House had been altered in no fewer than

eight ways that were visible on its exterior, and even noted that there was a "[s]olarium addition . . . [that] *unfortunately* appears on the [House's] main façade"[3] on Elm Place. ECF No. 20-8 at 126 (emphasis added). And although Daley claimed that "these alterations can be reversed, and the façades can regain their original appearance," *id.*, the relevant laws do not permit the Town to order the owner of a landmark to undertake restoration efforts. Similarly, while Daley also highlighted the fact that "the interior . . . sounds like it is absolutely fabulous," he admitted that "landmarking does not get involved with the interior." ECF No. 20-9 at 134. Daley also opined that the House still "nicely delineates the corner property which it is sited on" and that landmarking would be warranted to preserve the "overall streetscape" of Elm Place. ECF No. 20-9 at 126–28, 133. Yet the Town Code's definition of "landmark"—which refers to a structure's "antiquity or uniqueness of architectural design" or its importance to the locale's "development, heritage or cultural characteristics"—does not appear to encompass buildings whose importance lies in preserving the way a street appears. Hempstead, N.Y., Code § 76-1.[4]

---

[3] Merriam-Webster defines "façade" as "the front of a building." *See* https://www.merriam-webster.com/dictionary/facade.

[4] In fact, concerns about a streetscape seem more relevant to designating historic districts as opposed to individual landmarks. *See, e.g.*, Landmark Designation, City of New York, https://www1.nyc.gov/site/lpc/about/landmark-

In the end, the Landmarks Commission unanimously voted in favor of recommending landmark designation to the Town Board. ECF No. 20-9 at 162–63. In its one-page written decision, the Landmarks Commission explained its reasoning: "[T]he home exemplifies the Colonial Revival style so important a century ago; and the home has a significant historical connection to the community and Town through the families that lived there, and the early phase of suburbanization in Wantagh." ECF No. 20-10 at 2.

On February 2, 2021, the Town Board held a public hearing to review the Landmarks Commission's recommendation, at which the Town Board heard comments in favor of and opposed to that recommendation. ECF No. 20-11 at 14. The realtor who sold the House to plaintiff noted that one of the Motschwillers subdivided the Property in 1992, and "a new house was built" with "[n]o one rais[ing] any objections that [the House] was some landmark." *Id.* at 36. This new home was built at 3163 Elm Place, next door to the property on which the House stands. Yet this new house was not built in the Colonial Revival style and has a two-

---

designation.page (contrasting "[i]ndividual landmarks[, which] are standalone structures that have architectural, cultural, or historical significance" with "[h]istoric districts[, which] are collections of landmark buildings that, together, create a distinct sense of place").

car garage and driveway of a corresponding size on its front.[5] Indeed, Daley himself wrote that the House "compliments the remaining *older* revival styled homes" on Elm Place, without any reference to the effect caused by the construction of this new house. ECF No. 20-8 at 127 (emphasis added). At the end of the hearing, the Town Board, without providing any explanation, unanimously approved the Landmarks Commission's recommendation, designating the Property a historical landmark. ECF No. 20-11 at 37–38; ECF No. 20-12 at 2. On February 10, 2021, eight days after the hearing, plaintiff filed the complaint in this case. ECF No. 1.

It was three and a half months later, on May 25, 2021, that the Town Board provided the reasoning for its decision in a written resolution. ECF No. 21-1. The Town Board noted the community support for the landmark application. *Id.* at 7. Of obvious significance to the Town Board was the fact that the applicants' "expert," Paul Daley, "performed a quantitative comparison to previously landmark designated houses which show[ed] how favorably this property compares." *Id.* In the same breath, the Town Board set forth a paragraph-long summary of Daley's

---

[5] *See* Google Maps, https://goo.gl/maps/5nRa1cJzVNaiHk2o7. As the Ninth, Tenth, and D.C. Circuits have held, a court may "take judicial notice of a Google map and satellite image as a 'source[] whose accuracy cannot reasonably be questioned.'" *United States v. Perea–Rey*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012) (alteration in original) (quoting Fed. R. Evid. 201(b)); *Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013); *see United States v. Burroughs*, 810 F.3d 833, 835 n.1 (D.C. Cir. 2016). The Second Circuit, too, has relied on Google Maps in deciding cases. *See Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 76 n.8 (2d Cir. 2022).

credentials and *sua sponte* "accept[ed] him as an expert in the field." *Id.* at n.8. As the Town Board now concedes, however, neither Daley nor any other expert ever performed such a quantitative comparison.[6]

"[A]dopt[ing] the factual conclusions expressed by" those who supported a landmark designation and their "expert, Mr. Daley," and agreeing with the Landmarks Commission, the Town Board found:

> [T]he subject home on the Subject Property, constructed in 1925, uniquely exemplifies the Colonial Revival style of architecture so important a century ago, particularly during the early phase of suburbanization of the Town; that this unique home has a significant historical connection to the Wantagh community, as well as the Town as a whole, through the lives of the families who constructed this unique home, as well as those that later lived in, and made this their home, while significantly contributing to the early establishment, and then growth, of the Town and the Wantagh community. We also take note of the role this unique historical home plays in the historical, architectural, and cultural "streetscape" of the entire surrounding neighborhood.

---

[6] The Town Board's emphasis on an expert analysis that, it turns out, did not exist creates a serious issue. The Town Board's attorneys now seek to rewrite their client's decision by suggesting that the Board intended to refer to a quantitative comparison submitted by a local resident named Drew Gewuerz, an arbitrator without any professional expertise in history or architecture. On a motion to dismiss, I do not accept that suggestion, which merely comes from an attorney's argument. Significantly, although Gewuerz did submit something that he claimed was a "quantitative comparison," ECF No. 20-7 at 66, that submission merely remarked that six landmarked houses and the House "presented unique architectural style and features" ECF No. 20-6 at 55–57. Gewuerz did not discuss any of these allegedly unique features, and, unlike Daley, Gewuerz had no professional expertise upon which to draw to make this claim.

*Id.* at 8–9. Although the Town Board thus professed its view of the House's uniqueness on no fewer than four occasions, it never specified what made the House unique. Indeed, the Town Board acknowledged that "[o]n Long Island, native examples [of the Colonial Revival style] were readily available, and the Colonial Revival style found fertile ground in the Town of Hempstead." *Id.* at 10. Tellingly, although the Town Board invoked the supposed uniqueness of the home in an effort to explain why the House qualified as a landmark as local law defines that term, *see* Hempstead, N.Y., Code § 76-1, the Town Board now seeks dismissal on the grounds that, *inter alia*, "uniqueness has nothing to do with the standard" for landmarking and that the House "doesn't have to be unique in order to be designated as a landmark." ECF No. 28 at 7.

## STANDARD OF REVIEW

The Landmarks Commission and Town Board move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and pursuant to Rule 12(b)(6) for failure to state a claim. "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 712 (2d Cir. 2019) (internal citation omitted). "In considering a motion to dismiss for lack of subject matter jurisdiction, [a court] accept[s] as true all material factual allegations in the complaint." *Atl. Mut.*

*Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992) (internal citation omitted). Evidence outside the pleadings may be considered in determining subject matter jurisdiction. *See Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000).

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In deciding a motion under Rule 12(b)(6), a court must "constru[e] the complaint liberally, accept[ ] all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (internal quotation marks omitted). In addition to the facts alleged in the complaint, documents that the complaint incorporates by reference and material subject to judicial notice may also be considered. *See Vengalattore v. Cornell Univ.*, 36 F.4th 87, 102 (2d Cir. 2022).

## DISCUSSION

### I. *Claims Against the Landmarks Commission*

The Landmarks Commission is correct that it is not an entity subject to suit. Under New York law, "a department of a municipal entity is merely a subdivision of

the municipality and has no separate legal existence." *Polite v. Town of Clarkstown*, 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999) (internal quotation marks omitted). The Town Code makes clear that the Landmarks Commission is a "sub-unit or agency of the municipal government." *Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 164 (D. Conn. 2005); *see* Hempstead, N.Y., Code §§ 76-2, 76-3, 76-6. Accordingly, the claims against the Landmarks Commission are dismissed. *See Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007) (affirming district court's dismissal of claims against the New York City Police Department as "a non-suable agency of the City"); *Ruston v. Town Bd. for Town of Skaneateles*, No. 06-CV-927, 2009 WL 3199194, at *1, *4 (N.D.N.Y. Sept. 30, 2009), *aff'd,* 610 F.3d 55 (2d Cir. 2010).

II. *Ripeness and Finality*

The Town Board argues that subject matter jurisdiction is lacking because plaintiff's claims are neither ripe nor final. "The central concern [of the ripeness doctrine] is whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3532 (3d ed. 2008). This case does not present any of those concerns.

The Town Board principally relies on *Williamson County Regional Planning Commission v. Hamilton Bank*, which held that a plaintiff's taking claim "is not ripe" for adjudication until (1) "the government entity charged with implementing the

regulations has reached a final decision regarding the application of the regulations to the property at issue," and (2) the plaintiff has exhausted state remedies to receive just compensation. 473 U.S. 172, 186, 194–95 (1985). In *Knick v. Township of Scott*, the Supreme Court overruled *Williamson County*'s second prong and held that "a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it," "regardless of post-taking remedies that may be available to the property owner." *Knick*, 139 S. Ct. 2162, 2170 (2019). *Williamson County*'s "final decision" prong, however, remains good law. *See Pakdel v. City & Cnty. of San Francisco*, 141 S. Ct. 2226, 2228–30 (2021) (per curiam).

Yet as the Supreme Court has recently explained, "[t]he finality requirement is relatively modest. All a plaintiff must show is that there is no question about how the regulations at issue apply to the particular land in question.'" *Id.* at 2230 (internal quotation marks omitted) (alterations adopted). "[N]othing more than *de facto* finality is necessary." *Id.*[7]

Here, the Town government "has reached a conclusive position" and its decision is final. *Id.* at 2231. The Landmarks Commission held three hearings on the

---

[7] Even before *Knick* and *Pakdel*, the Second Circuit held that "[b]ecause *Williamson County* is a prudential rather than a jurisdictional rule, we may determine that in some instances, the rule should not apply and we still have the power to decide

landmark application, which plaintiff strenuously opposed, and recommended landmark status. Likewise, the Town Board held a hearing before it adopted the recommendation, again over plaintiff's opposition. There is no process for an administrative appeal from the Town Board. And contrary to the Town Board's argument, there are no reasonable "avenues [that] still remain for the government to clarify or change its decision." *Id.* All told, the landmarking decision was issued after a quasi-adversarial process over plaintiff's repeated and express objection. It is that decision that is final and ripe and forms the basis of plaintiff's claims.

Nevertheless, in support of its ripeness/finality argument, the Town Board would have plaintiff "seek a zoning variance to build a new house, or two," ECF No. 20-15 at 14, and ask the Landmarks Commission for permission to "mov[e] . . . alter[] . . . or demoli[sh]" the House, Hempstead, N.Y., Code § 76-10(B). But as the Second Circuit held in *Sherman v. Town of Chester*, a plaintiff's decision to forgo a game of the kind described in Joseph Heller's *Catch-22* does not render government action any less final or a case any less ripe. *See* 752 F.3d 554, 556–57, 562 (2d Cir. 2014). *Williamson County* does not require a plaintiff "to submit a plan for development of his property to the proper state authorities[ when] such a submission would [be] pointless." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 n.3

---

the case." *Sherman v. Town of Chester*, 752 F.3d 554, 561 (2d Cir. 2014) (quotation marks omitted).

(1992) (quotation marks and citations omitted) (alterations adopted); *see also Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 349 (2d Cir. 2005) (recognizing a futility exception to the finality requirement). Here, the House straddles the center of the Property in a way that prevents plaintiff from building a second house, and there is no question that the Landmarks Commission would not permit the relocation, demolition, or material alteration of the House. The Landmarks Commission just voted to designate the House a landmark over plaintiff's express objection, and the undisputed goal of the landmark designation was to assure the preservation of the House at its current location.

Nor does the fact that plaintiff has not applied to the Landmarks Commission for permission to move or demolish the House render its claimed injury "conjectural." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 945 F.3d 83, 110 (2d Cir. 2019). The burdens of the landmark designation themselves cause plaintiff an injury. As the Supreme Court has recognized, the property's "[f]inal designation as a landmark results in restrictions upon the property owner's . . . use of the landmark site." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 111 (1978). Now that the property is landmarked, the Landmarks "Commission must approve in advance any proposal to alter the exterior architectural features of the landmark or to construct any exterior improvement on the landmark site." *Id.* at 111–12; *see* Hempstead, N.Y., Code §§ 76-10, 76-11. If

17

that was not enough (which it is), plaintiff already subdivided the Property with the express goal of demolishing the House and building two new homes. This "conduct . . . implicate[s] . . . the operation of the challenged" government action because plaintiff can no longer build these new homes without securing permission from the Landmarks Commission. *Congregation Rabbinical Coll.*, 945 F.3d 83 at 110.

In sum, plaintiff's claims are ripe and are properly before the Court because the local government has made a final decision, not only subjecting the property to the whims of the Landmarks Commission, but effectively nullifying the subdivision approval plaintiff obtained from the Planning Commission and preventing plaintiff from implementing its plan to demolish the House and build two new homes.

III. *Takings Clause Claims*

The Fifth Amendment's Takings Clause provides that no "private property [shall] be taken for public use, without just compensation." U.S. Const. amend. V. "The law recognizes two species of takings: physical takings and regulatory takings." *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006). This case involves an alleged regulatory taking, which occurs "when the government acts in a regulatory capacity" to infringe on an individual's property rights. *Id.* A regulatory action will only be "recognized as a taking" when the "regulation goes too far." *Lucas*, 505 U.S. at 1014 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). "Regulatory takings are further subdivided into categorical and non-

categorical takings." *Sherman*, 752 F.3d at 564 (quotation marks omitted). "A categorical taking occurs in 'the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted.'" *Id.* (emphasis in original) (quoting *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002)). "'Anything less than a complete elimination of value, or a total loss,' is a non-categorical taking." *Id.* at 564 (quoting *Tahoe–Sierra*, 535 U.S. at 330). Plaintiff alleges a categorical and a non-categorical taking in Counts One and Two of its complaint, respectively.

A. *One Parcel or Two?*

"Because [the] test[s] for regulatory taking require[] [courts] to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property whose value is to furnish the denominator of the fraction." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987) (internal quotation marks omitted); *see, e.g.*, *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1180 (Fed. Cir. 1994) (calling this "the denominator problem"). Here, plaintiff argues that the Property, which had been subdivided prior to the landmarking and thus incorporates two separate lots, should be viewed as two individual properties. Under this view, the Town Board has allegedly taken two separate properties and each individual property "furnish[es] the [entire] denominator" for these two

takings, respectively. *Keystone*, 480 U.S. at 497. The Town Board disagrees, claiming that the Property should "be viewed in its entirety," not as two subdivided lots. ECF No. 20-15 at 17. If the Town Board is correct, only one property could have been taken and both subdivisions of the Property together "furnish the denominator" in analyzing that alleged taking. *Keystone*, 480 U.S. at 497.

While the Supreme Court has been clear that the denominator consists of the "parcel as a whole," *i.e.*, not individual sticks of the bundle of property rights associated with one parcel or individual physical portions of that parcel, *id.* (quoting *Penn Cent.*, 438 U.S. at 130–31), it has been less clear about the proper test for how to define the "parcel." In its most recent explication of the subject, the Supreme Court held that whether a landowner's property should be viewed as one or more parcels depends on if "reasonable expectations about property ownership would lead a landowner to anticipate that his holdings would be treated as one parcel, or, instead, as separate tracts." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1945 (2017). Pursuant to *Murr*, a landowner's reasonable expectations stem from "a number of factors[,] . . . includ[ing] the treatment of the land under state and local law; the physical characteristics of the land; and the prospective value of the regulated land." *Id.* Here, the documentary evidence and plaintiff's allegations, taken as true, indicate that one, if not two, of these factors weigh in plaintiff's favor.

One preliminary note: The Supreme Court did not specify the point in time at which a landowner's reasonable expectations should be assessed—whether at the time of purchase or the time of the alleged taking. (In *Murr* itself, those events occurred simultaneously because the regulation that effected the alleged taking was already in place when the landowner took possession of the property. *See id.* at 1940–41.) Nonetheless, takings jurisprudence usually focuses on the state of play around "the time of the taking." *See, e.g. Horne v. Dep't of Agric.*, 576 U.S. 350, 369 (2015). Thus, this motion turns on whether plaintiff has plausibly plead that "reasonable expectations about property ownership would lead [it] to anticipate that [its] holdings would be treated . . . as separate tracts," *Murr*, 137 S. Ct. at 1945, between the time of purchase and "the time of the taking," *i.e.*, the landmarking of the Property, *Horne*, 576 U.S. at 369.

Here, the "treatment of the land under state and local law" supports treating each subdivision as an independent parcel. *Murr*, 137 S. Ct. at 1945. As explained above, plaintiff succeeded in subdividing the property before the landmarking occurred. Thus, the Property now consists of two separate lots under local law. Although *Murr* rejected the landowners' argument that courts should apply "a *presumption* that lot lines define the relevant parcel in *every* instance," lot lines are nonetheless relevant to the analysis of a how a property is treated under state and local law, especially where, as here, those lot lines were drawn with direct

"government oversight" and are not the product of "gamesmanship by landowners." *Id.* at 1947–48 (emphasis added). Moreover, when plaintiff's subdivision was approved—despite 61 comments from Wantagh residents—no state or local law or regulation stood in the way of plaintiff's plan to demolish the House and build a freestanding dwelling on each subdivision. Indeed, before granting plaintiff's application for subdivision, the Planning Commission allegedly "investigated the Property's potential for designation as a historical landmark and determined that the Property [did not] present any evidence of any historical or architectural significance to warrant preservation and designation as a historic landmark." Compl. ¶ 43.

Moreover, even if the relevant expectations are those at the time of plaintiff's purchase of the Property, when it was not yet subdivided, the record plausibly suggests that state and local law, and the history of that law's application to the Property, would support a reasonable expectation that the Planning Commission would grant plaintiff's contemplated subdivision application and the Property would thus be treated as two separate tracts. First, the property on which the House sat had already been subdivided in 1992, without issue, and the previous owners built a house on that new subdivision. Second, when plaintiff purchased the Property, it was of sufficient size to accommodate two lots, and all the parties involved in the sale— plaintiff, the sellers, and the realtor—operated under the assumption that plaintiff would be able to subdivide the property "as-of-right," demolish the House, and build

two new ones. Compl. ¶ 32. Third, a reasonable purchaser would not necessarily have reason to suspect that the House would be a candidate for a landmark designation. Indeed, in the immediate aftermath of the purchase of the House, the vice president of the Preservation Society told *Newsday* that the Society did not "believe [the House] ha[d] any historical value" *Newsday* Article; *see* Compl. ¶ 39. Similarly, Thomas Watson, the president of the Preservation Society, and "many of [its] Trustees were not aware of the historical significance of the house." ECF No. 20-7 at 84.

Contrasting this case with *Murr* illustrates how the "treatment of the land under state and local law" favors plaintiff in this case. 137 S. Ct. at 1945. In *Murr,* the landowners complained that a state law "effectively merged" two adjacent lots they owned. *Id.* at 1941. The Supreme Court observed that this state law had been in effect since 1976, while the two lots only came under the common ownership of the landowners in 1995. *Id.* at 1940–41. In ruling that the "treatment of the land under state and local law" favored treating the two lots in *Murr* as one parcel, the Court explained that "[a] reasonable restriction that predates a landowner's acquisition . . . can be one of the objective factors that most landowners would reasonably consider in forming fair expectations about their property." *Id.* at 1945. The Court then went on to emphasize that the landowners' "land was subject to this regulatory burden . . . only because of [their] voluntary conduct in bringing the lots under common

ownership *after* the regulations were enacted." *Id.* at 1948 (emphasis added). Here, by contrast, the landmarking occurred only after plaintiff purchased and subdivided the property. Thus, this case presents "a use restriction which [was] triggered only after, or because of, a change in ownership" and the development plans of the new owner, a scenario that the *Murr* Court suggested would support a conclusion of treating parcels separately. *Id.* at 1945. And, as explained, the subdivision process allegedly incorporated a determination that nothing about the House warranted preservation.

The third *Murr* factor, "the prospective value of the regulated land," could also weigh in plaintiff's favor. *Id.* This factor seeks to assess whether restraining the development of a portion of a regulated land "adds value to the remaining property, such as by increasing privacy, expanding recreational space, or preserving surrounding natural beauty." *Id.* at 1946. Here, prohibiting plaintiff from separately developing one of the subdivisions may "preserv[e]" whatever aesthetic and historical value the Town Board determined the House possesses. *Id.* But at the same time, as alleged in the Complaint, this development restriction adds no economic value to any part of the property whatsoever. In fact, it reduces it. If not for the restriction, plaintiff would be able to sell each developed subdivision for over $300,000 more than the purchase price of the entire property. Compl. ¶¶ 87–88.

Moreover, due to the landmark designation, the value of the Property fell by approximately $150,000. Compl. ¶¶ 90–91.

On this motion to dismiss, the Town Board's contention that the Property should be viewed as one parcel must be rejected. As Judge Easterbrook has keenly observed:

> If we are to have multiple factors, we should also have a trial. A fact-bound approach calling for the balancing of incommensurables, an approach in which no ascertainable legal rule determines a unique outcome, is one in which the trier of fact plays the principal part. That there is a legal overlay to the factual question does not affect the role of the trier of fact.

*Sec'y of Labor v. Lauritzen,* 835 F.2d 1529, 1542 (7th Cir. 1987) (Easterbrook, J., concurring) (internal citations omitted); *Narayan v. EGL, Inc.*, 616 F.3d 895, 901 (9th Cir. 2010); *see also Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1158–59 (11th Cir. 2021); *Imars v. Contractors Mfg. Servs., Inc.*, No. 97-3543, 1998 WL 598778, at *3 (6th Cir. Aug. 24, 1998). Under these circumstances, I "cannot readily say . . . that the ultimate conclusion as to whether" plaintiff reasonably expected that its property would be treated as two parcels "is one of law." *Lauritzen,* 835 F.2d at 1543. "The drawing of inferences from subordinate to 'ultimate' facts is a task for the trier of fact—if, under the governing legal rule, the inferences are subject to legitimate dispute," which in this case, they are. *Id.*; *Narayan*, 616 F.3d at 901; *see also Imars*, 1998 WL 598778, at *3.

25

B. *Categorical Taking Claim*

Plaintiff first claims that the Town Board effected a categorical taking of one of its two subdivided lots by "effectively nullif[ying] [p]laintiff's subdivision of the Property" and rendering impossible plaintiff's plan to develop and sell each property separately. Compl. ¶ 77. But that does not establish a categorical taking. Rather, a categorical taking exists only "when *no* productive or economically beneficial use of land is permitted." *Tahoe–Sierra*, 535 U.S. at 330 (emphasis in original). In this case, even if each of the subdivisions is considered separately, the landmarking still allows plaintiff to derive at least *some* "productive or economically beneficial use" from each subdivision. *Id.* After all, one can reside in the portion of the House that sits on each subdivision, and the property can still be sold to be used as a residence. It is true that all this effectively depends on the same person owning the other subdivision as well, but that does not alter the fact that plaintiff can still derive at least *some* "productive or economically beneficial use" from each subdivision. *Tahoe–Sierra*, 535 U.S. at 330. Thus, the Town Board's motion to dismiss plaintiff's categorial taking claim is granted.

C. *Non-Categorical Taking Claim*

Plaintiff also asserts a claim for a non-categorical/*Penn Central* taking. "The *Penn Central* analysis of a non-categorical taking requires an intensive *ad hoc* inquiry into the circumstances of each particular case." *Sherman*, 752 F.3d at 565

26

(internal quotation marks omitted). Under *Penn Central*, courts weigh three factors to determine whether a taking has occurred: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 137 S. Ct. at 1943; *see Penn Cent.*, 438 U.S. at 124. The consideration of these factors aims to "identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). At the same time, the inquiry is "informed by the purpose of the Takings Clause, which is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617–18 (2001) (internal quotation marks omitted).

Plaintiff's allegations do not plausibly state a claim for a non-categorical taking under *Penn Central*'s factors in the event that the Property is ultimately determined to consist of only one parcel.

### 1.   *Economic Impact*

With the property viewed as one parcel, the economic-impact factor weighs against plaintiff. Plaintiff purchased the Property for $1,000,000 and alleges that the Property is now worth $850,000, resulting in a "capital loss of approximately

"$150,000," or 15% of the original value. Compl. ¶¶ 87, 90–91. But "a reduction in the value of property is not necessarily equated with a taking." *Andrus v. Allard*, 444 U.S. 51, 66 (1979). Here, the 15% diminution in value is not "severe" and, as noted earlier, plaintiff may still sell the Property for "residential purposes." *Murr*, 137 S. Ct. at 1949; *see also Vanderveer v. Zoning Bd. of Appeals Town of E. Hampton*, No. 20-4252, 2021 WL 3745741, at *1 (2d Cir. Aug. 25, 2021). Unlike other cases where courts have found the economic impact to weigh in favor of the landowner, plaintiff has not been "effectively prevented . . . from making any economic use of [its] property." *Sherman*, 752 F.3d at 565. Indeed, courts routinely reject taking claims where the alleged diminution in value is much greater. *See Clayland Farm Enters., LLC v. Talbot County*, 987 F.3d 346, 354 (4th Cir. 2021) (finding 40% diminution in value insufficient and "not[ing] that other circuits have found no regulatory taking when presented with diminutions in value of 75 percent and 92.5 percent"); *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 633 (9th Cir. 2020) (finding approximate 16.8% diminution in value weighed against finding a taking).

Plaintiff also alleges that it lost reasonably expected future profits of approximately $600,000 because it is unable to sell the two new homes it planned to build. Compl. ¶¶ 88, 91. But the "deprivation of the right to use and obtain a profit from property is not, in every case, independently sufficient to establish a taking." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 436 (1982). "A

regulation is not a taking merely because it 'prohibit[s] the most beneficial use of the property.'" *Quinn v. Bd. of Cnty. Commissioners*, 862 F.3d 433, 442 (4th Cir. 2017) (quoting *Penn Cent.*, 438 U.S. at 125). Indeed, the Second Circuit has "rejected the notion that loss of profit—much less loss of a reasonable return—alone could constitute a taking." *Park Ave. Tower Assocs. v. City of New York*, 746 F.2d 135, 139 (2d Cir. 1984). Rather, "[t]he crucial inquiry . . . is not whether the regulation permits plaintiffs to use the property in a 'profitable' manner, but whether the property use allowed by the regulation is sufficiently desirable to permit property owners to 'sell the property to someone for that use.'" *Id.* (quoting *Sadowsky v. New York,* 732 F.2d 312, 318 (2d Cir. 1984)). Here, the Property remains marketable; plaintiff acknowledges it may sell the Property for $850,000. The first factor thus weighs in favor of the Town Board. *See Fed. Home Loan Mortg. Corp. v. New York State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 48 (2d Cir. 1996) (finding no regulatory taking where mortgage company could "still rent apartments and collect the regulated rents" even though it would "not profit as much as it would under a market-based system").

### 2. *Investment-Backed Expectations*

The second *Penn Central* consideration is the extent to which the regulatory action "has upset [plaintiff's] investment-backed economic expectations by altering its rights as to a constitutionally protected property interest." *1256 Hertel Ave.*

*Assocs., LLC v. Calloway*, 761 F.3d 252, 266 (2d Cir. 2014). "The purpose of the investment-backed expectation requirement is to limit recovery to owners 'who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime.'" *Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996) (quoting *Loveladies Harbor*, 28 F.3d at 1177). The Town Board argues that plaintiff did not lose a constitutionally protected property interest, and relatedly, that any investment expectation it had was not reasonable. These arguments are unpersuasive. This *Penn Central* factor weighs in plaintiff's favor, regardless of whether the Property is viewed as one or two parcels.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). The Second Circuit uses a "strict entitlement test," focusing "on the extent to which the deciding authority may exercise *discretion* in arriving at a decision, rather than on an estimate of the probability that the authority will make a specific decision." *Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir. 1995) (internal quotation marks omitted).

The Town Board compares plaintiff's claim to a general interest in an existing classification of a property under zoning ordinances. This is because "[u]nder New York law" the source of plaintiff's property rights, "a landowner has no vested

interest in the existing classification of his property." *Greene v. Town of Blooming Grove*, 879 F.2d 1061, 1065 (2d Cir. 1989). But plaintiff is not challenging a zoning reclassification. Rather, it argues that it had a vested interest in building two new homes on the approved subdivisions. Unlike the zoning classification cases the Town Board relies on, there is no remaining discretion in conferring the subdivision and resultant construction benefit on plaintiff. The Planning Commission approved the subdivision and the local zoning code permits building a single-family residence on each subdivision.

Plaintiff has also alleged sufficient facts to show that it had a reasonable investment-backed expectation to build and sell two new houses that was frustrated by the landmark designation. Courts use "an objective analysis" here. *Bridge Aina Le'a*, 950 F.3d at 633 (internal quotation marks omitted). "Distinct investment-backed expectations implies reasonable probability, not starry eyed hope of winning the jackpot if the law changes." *Id.* (internal quotation marks omitted) (alterations adopted). "A reasonable investment-backed expectation must be more than a unilateral expectation or an abstract need." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005–06 (1984) (internal quotation marks omitted).

At the time plaintiff acquired the Property, the Property was within a zoning district that permitted building lots with a minimum area of 6,000 square feet. Compl. ¶ 31. Plaintiff accordingly filed an application to subdivide the Property into

two lots of approximately 10,000 square feet each. *Id.* ¶ 33. As previously observed, that application included a letter from the Town's Chief Building Plan Examiner, certifying that plaintiff's "proposed subdivision is in compliance with the requirements of the Town of Hempstead Building Zone Ordinance." *Id.* ¶ 34. And, as already explained, plaintiff plausibly had little, if any, reason to expect that the House would be designated a landmark. Thus, plaintiff had a reasonable expectation that it would be able to use the Property for its planned development. *Cf. Murr*, 137 S. Ct. at 1949 (finding that this second factor weighed against the landowners because they could not "claim that they reasonably expected to sell or develop their lots separately given the regulations which predated their acquisition of both lots").

### 3.    *Character of the Governmental Action*

The third *Penn Central* factor weighs in favor of the Town Board. "[T]he 'character of the government[al] action' is another way to examine the severity of the government interference with property rights." *S. Grande View Dev. Co. v. City of Alabaster*, 1 F.4th 1299, 1311 (11th Cir. 2021) (quoting *Lingle*, 544 U.S. at 539). As with taking claims generally, the character-of-the-governmental-action inquiry does not incorporate "a means-ends test[ that] asks, in essence, whether a regulation of private property is *effective* in achieving some legitimate public purpose." *Lingle*, 544 U.S. 542 (emphasis in original). Nor does it "probe[] the regulation's underlying validity." *Id.* at 543; *see also Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260,

1278 (Fed. Cir. 2009). Thus plaintiff's arguments regarding the lack of merit to this specific landmarking and the abuse of process it allegedly entailed are not relevant to this analysis. *See S. Grande View*, 1 F.4th at 1311–1312 (holding that *Lingle* dictates that evidence of the "[s]pecific [m]otives" and "the rationale behind" an alleged taking "is [i]rrelevant [p]ursuant to the *Penn Central* [f]actors").[8]

Like other landmarkings, which courts have routinely upheld, *see, e.g.*, *Penn Central*, 438 U.S. 104, the landmarking of the Property, at least if the Property is viewed as one parcel, does not have "effects [that] are functionally comparable to government appropriation or invasion of private property." *Lingle*, 544 U.S. at 542; *see also 1256 Hertel Ave.*, 761 F.3d at 265. To the contrary, plaintiff is still permitted to use or sell the home as a private residence and is under no obligation to admit members of the public for any reason. And although the landmarking does restrict some aspects of plaintiff's rights with respect to the Property, that "interference arises from some public program adjusting the benefits and burdens of economic life

---

[8] In *Sherman*, the Second Circuit stated that the fact that the government's "alleged conduct was unfair, unreasonable, and in bad faith" supported the court's decision to weigh "the 'character' factor" in the plaintiff's favor. 752 F.3d at 565. The facts in *Sherman*, however, involved a *Catch-22*-like situation where the government placed the plaintiff on a regulatory merry-go-round by adopting entirely new zoning regulations and generally applicable development restrictions that were targeted at restraining only the plaintiff's development of his property and not at advancing any public interest whatsoever. *See id.* at 556–57. No such circumstances are present here.

to promote the common good," *i.e.*, the Town's Landmarks Preservation Ordinance. *Penn Central*, 438 U.S. at 124; *see also Buffalo Tchrs.*, 464 F.3d at 375. Thus, the "character of the governmental action" here does not suggest that plaintiff's "private property has been 'taken' for purposes of the Fifth Amendment." *Lingle*, 544 U.S. at 539, 542. Weighing the three *Penn Central* factors, plaintiff has not stated a claim for a non-categorical taking if the Property is viewed as one parcel.[9]

If the Property is viewed as two parcels, however, plaintiff's allegations suffice to state a claim for a non-categorial taking. The alleged economic impact and interference with investment-backed expectations—denying any practical independent value to one, if not both, of the parcels and frustrating plaintiff's plan to develop and profit off the property—would be so severe that plaintiff would state a claim for a non-categorical taking regardless of the character of the governmental action. Because, as explained, plaintiff has plausibly alleged that the Property should

---

[9] While this conclusion requires balancing multiple factors, the *Penn Central* balancing test applied here represents a legal inquiry intended to determine whether a factual scenario amounts to a "taking" under the Fifth Amendment. This differs from the *Murr* test discussed above, which aims to assess a "reasonable [landowner's] expectations about property ownership," 137 S. Ct. at 1945, a quasi-factual question more apt for a jury's determination. Thus, while the approach called for by Judge Easterbrook in *Lauritzen* applies to the adjudication of the *Murr* issue, it does not apply to the application of *Penn Central* to the facts as alleged in the complaint and as appearing in other materials which can be considered on a motion to dismiss.

be viewed as two parcels, the Town Board's motion to dismiss plaintiff's non-categorical taking claim is denied.

IV. *Substantive Due Process*

The Town Board next moves to dismiss plaintiff's substantive due process claim. "[T]he substantive component of the Fourteenth Amendment's Due Process Clause forbids the government from burdening, in a constitutionally arbitrary way, an individual's property rights." *O'Connor v. Pierson*, 426 F.3d 187, 204 (2d Cir. 2005); *see also Lingle*, 544 U.S. at 542–43. "[A] party asserting a deprivation of substantive due process must first establish a valid property interest within the meaning of the Constitution." *Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir. 1996). "Second, the [plaintiff] must demonstrate that the defendant acted in an arbitrary or irrational manner in depriving him of that property interest." *Id.* As explained above, plaintiff has satisfied the first prong. It had a constitutionally protected property interest in developing each subdivision of the Property as a separate tract, and the landmarking deprived it of that interest.

Plaintiff's claim also survives the second prong of the substantive due process analysis. The complaint pleads facts sufficient to plausibly show that the defendants "abuse[d] [their] landmark power" and engaged in a sham landmarking. ECF No. 19 at 10. Viewing the record in the light most favorable to plaintiff, the landmark application was premised on the erroneous claim that the House was the only

example of Colonial Revival architecture in Wantagh. Indeed, the record plausibly demonstrates that such homes "are common and may be observed . . . in and around [Wantagh] and throughout Long Island." Compl. ¶ 50. As previously observed, the Town Board now seeks dismissal on the grounds that "uniqueness has nothing to do with the standard" and that the House "doesn't have to be unique in order to be designated as a landmark." ECF No. 28 at 7. Indeed, the Town goes as far as to argue that so long as a property "may fall within the core provisions of landmarking," the Town does not "need" to meet "any standard at all" before designating the property a landmark. ECF No. 28 at 23.

Experts on both sides of the landmarking debate agreed that the House had visible features and alterations that detracted from its historical value, including a solarium addition on its façade. Significantly, the Landmarks Commission has no power to order plaintiff to expend funds restore the House, which may be substantial. Moreover, the Property had already been subdivided and a new house, with a two-car garage and driveway, was built next door without incident less than thirty years prior, calling into question the legitimacy of any concerns regarding the "streetscape."

The Town Board also partially based the landmark designation on the House's "significant historical connection to the Wantagh community" through the three families that lived there. ECF No. 21-1 at 9. But the Town Board does not

sufficiently undermine the plausibility of plaintiff's allegation that "thousands of homes in the Town and throughout Long Island have [] similar histories concerning local notables, war veterans and Eagle Scouts." Compl. ¶ 70. Indeed, Thomas Watson, the president of the Preservation Society, lives in a house that is "over 250 years old and was once the home of Thomas Jackson[,] . . . a Revolutionary War soldier [who] is buried in Wantagh's historic Jackson family cemetery[,] [where] [h]is headstone still[] stands." ECF No. 32 at 1. Yet Watson's house is not landmarked. Moreover, "nothing truly historic took place in the [landmarked] home." ECF No. 20-11 at 25. Indeed, just before the landmarking hearings, the vice president of the "Wantagh Preservation Society," said that the society did not deem the House to be "historical." *Newsday* Article. Even Watson and "many of [the Preservation Society's] Trustees were not aware of the historical significance of the house." ECF No. 20-7 at 84. Recall too, the Planning Commission allegedly also "determined that the Property [did not] present any evidence of any historical or architectural significance to warrant preservation and designation as a historic landmark." Compl. ¶ 43.

Aspects of the landmarking process lend additional plausibility to plaintiff's due process claim. The Town Board provided an explanation for its decision almost four months after it rendered it, three and a half months after plaintiff filed this lawsuit. In that explanation, the Town Board purported to rely on "a quantitative

comparison" "performed" by Paul Daley, "an expert in [the] field" of "architectural history[y]." ECF No. 21-1 at 7 & n.8 But no such quantitative comparison existed. The Town Board also professed its view of the House's uniqueness on no fewer than four occasions, but never specified what made the House unique. Indeed, it even acknowledged that "[o]n Long Island, native examples [of the Colonial Revival style] were readily available, and the Colonial Revival style found fertile ground in the Town of Hempstead." *Id.* at 10.

Plaintiff has thus plausibly alleged that the Town Board exercised its power under the Landmarks Preservation Ordinance in an "arbitrary or irrational manner" when it landmarked the House. *Crowley*, 76 F.3d at 52. Accordingly, the Town Board's motion to dismiss plaintiff's substantive due process claim is denied.

V. *Vagueness*

Plaintiff's fourth and final cause of action alleges that the Town's Landmarks Preservation Ordinance is void for vagueness. Plaintiff mounts both facial and as-applied challenges. "A facial challenge is an attack on a statute itself as opposed to a particular application." *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015); *see also Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications."). Such an attack is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the

[ordinance] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). By contrast, in an as-applied claim, "the challenger asserts that a law cannot constitutionally be applied to the challenger's individual circumstances." *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018). Courts "typically evaluate vagueness challenges to statutes not threatening First Amendment interests . . . only on an as-applied basis." *United States v. Requena*, 980 F.3d 30, 40 (2d Cir. 2020) (internal quotation marks omitted) (alterations adopted).

"[A]ll vagueness challenges—whether facial or as-applied—require [a court] to answer two separate questions: whether the statute gives adequate notice, and whether it creates a threat of arbitrary enforcement." *United States v. Wasylyshyn*, 979 F.3d 165, 175 (2d Cir. 2020). Plaintiff's complaint can be interpreted as raising both questions. *See* Compl. ¶¶ 108–18.

However, it is unnecessary to explore these claims at length at this time.

If one of a number of integrally related causes of action have to be tried, it makes little sense to grant a motion to dismiss as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion to dismiss was improperly granted. As observed by Judge Clark in an analogous context: "[T]here seems no question that in the long run fragmentary disposal of what is essentially one matter is unfortunate not merely for the waste of time and expense caused the parties and the courts, but because of the mischance of differing dispositions of what is essentially a single controlling issue."

*Thibodeaux v. Travco Ins. Co.*, No. 13–CV–05599, 2014 WL 354656, at *2 (E.D.N.Y. January 31, 2014) (quoting *Audi Vision Inc. v. RCA Mfg. Co.*, 136 F.2d

621, 625 (2d Cir. 1943)). Thus, the Town Board's motion to dismiss the vagueness

claim is denied.

## CONCLUSION

The Landmarks Commission's motion to be dismissed is granted. The Town

Board's motion to dismiss is granted in part and denied in part. Plaintiff's claim for

a categorical taking is dismissed, but plaintiff may proceed with its other claims.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York                          Edward R. Korman
August 17, 2022                             United States District Judge