UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————

SOUTH NASSAU BUILDING CORP.,

              Plaintiff,

    – against –

TOWN BOARD OF THE TOWN OF
HEMPSTEAD AND TOWN OF
HEMPSTEAD LANDMARKS
PRESERVATION COMMISSION,

              Defendants.

—————————————————————

**<u>MEMORANDUM & ORDER</u>**

21-cv-00715 (ERK) (AYS)

KORMAN, *J.*:

In February 2021, the Town Board of the Town of Hempstead (the "Board")
designated a house located in Wantagh, New York, as a historic landmark. The house
was built in 1925 in the Colonial Revival style and is owned by the plaintiff, South
Nassau Building Corp. The plaintiff opposed the landmark designation because it
hoped to demolish the house and build two new houses. The house's landmark status
now impedes it from doing so. In response to this setback, the plaintiff brought this
suit against the Board and the Town of Hempstead Landmarks Preservation
Commission (the "Landmarks Commission") challenging the landmark designation
on several constitutional grounds. Earlier, I dismissed the plaintiff's claims against
the Landmarks Commission and its claim against the Board alleging a categorical

taking without just compensation in violation of the Takings Clause. *S. Nassau Bldg. Corp. v. Town Bd. of Hempstead*, 624 F. Supp. 3d 261, 281 (E.D.N.Y. 2022). The plaintiff now moves, and the Board cross-moves, for summary judgment on the plaintiff's remaining causes of action.

## BACKGROUND[1]

In March 2020, the plaintiff, South Nassau Building Corp., purchased a house located at 3171 Elm Place on the corner of Elm Place and Jones Avenue in Wantagh, New York, an unincorporated hamlet within the Town of Hempstead (the "Town"). ECF No. 42-22 ¶¶ 3, 7. The plaintiff intended to subdivide the property into two building lots; raise the existing house, garage, and swimming pool; and build two new houses that the plaintiff would sell for a profit. *Id.* ¶¶ 13, 18, 20. Applicable zoning regulations allow building lots of 6,000 or more square feet. *Id.* ¶¶ 9–10; Hempstead, N.Y., Bldg. Zone Ordinance § 29. The property is approximately 20,000 square feet and thus large enough to subdivide into two zoning compliant lots. ECF No. 42-22 ¶¶ 6, 10.

On July 30, 2020, the plaintiff, through its affiliated company, Fairweather Builders, Inc., applied to the Nassau County Planning Commission ("NCPC") for

---

[1] My decision of August 17, 2022, describes the facts of this case in detail based on the well pleaded allegations in the complaint and the record at that time. *See* 624 F. Supp. 3d at 264–69. I recount them briefly here, emphasizing facts that have since come to light.

approval of a minor subdivision dividing the property into two lots of approximately 10,000 square feet each.  *Id.* ¶ 24; ECF No. 41-8.  The proposed property line dividing the two lots ran through roughly the center of the property and bisected the existing house.  *See* ECF No. 42-16; ECF No. 41-4.  The plaintiff's application was accompanied by a letter from the Town's Chief Building Plan Examiner certifying that the proposed subdivision complied with the Town's zoning ordinance.  ECF No. 42-22 ¶ 25; ECF No. 41-8, at 6.

While the plaintiff's subdivision application was pending, a neighbor of the property, Joan Kemnitzer, applied to the Landmarks Commission requesting that the house be designated a landmark.  *Id.* ¶ 33; ECF No. 42-10, at 8–10.  Pursuant to the Town's Code, a landmark is "[a]ny place, structure or building of historical value or aesthetic interest by reason of its antiquity or uniqueness of architectural design or as part of the development, heritage or cultural characteristics of the town, county, state or nation."  Hempstead, N.Y., Code § 76-1.  Any building so designated may not be moved or demolished, nor may its exterior be altered or repaired, without prior approval of the Landmarks Commission.  *Id.* §§ 76-10, 76-11.

The Town's Landmarks Preservation Ordinance (the "Ordinance") sets forth the procedure for designating a place or building a landmark.  Any person, with or without the owner's consent, may initiate the process by applying to the Landmarks Commission.  Hempstead, N.Y., Code § 76-6(A).  If the Landmarks Commission

decides to consider the application, it must notify both the owner and nearby property owners, and "[a]ll such owners" must be allowed "to confer with the [C]ommission prior to a final recommendation by the Commission." *Id.* § 76-6(B). The Landmarks Commission then decides whether to recommend the property to the Board for designation, taking into account "the special character, ambiance, historical significance, aesthetic value and uniqueness of architectural design of the proposed landmark or landmark site wherever applicable." *Id.* § 76-6(A), (C). If the Commission so recommends, the Board must convene a public hearing to consider the recommendation and ultimately decide whether to designate the property a landmark. *Id.* § 76-6(C)–(D).

On September 17, 2020, while Kemnitzer's application was pending before the Landmarks Commission, the NCPC approved the plaintiff's subdivision application. ECF No. 42-22 ¶ 41; ECF No. 41-11. The plaintiff subsequently filed, and the Nassau County Clerk's Office accepted, two new deeds creating two new lots. ECF No. 42-22 ¶¶ 52–53; ECF No. 41-17. Nevertheless, the plaintiff could not move forward with its plan to demolish the house because the Town's Department of Buildings is prohibited from issuing permits to demolish a proposed landmark for 120 days after being notified that the Landmarks Commission is considering a landmark application. *See* Hempstead, N.Y., Code § 76-7(A).

4

The Landmarks Commission held three hearings on Kemnitzer's application: an initial hearing on October 27, 2020; and two public hearings on December 8, 2020, and January 5, 2021, respectively.  ECF No. 42-10, at 2; ECF No. 42-22 ¶ 43. In preparation for these hearings, Kemnitzer and two other neighbors, Patricia Emanuel and Heather Famiglietti, prepared a report highlighting the house's architecture and history.  ECF No. 42-10, at 34–90; ECF No. 42-11, at 118–196.  The Landmarks Commission considered a preliminary version of this report at its initial hearing and a final updated version with an addendum at its two subsequent public hearings.  ECF No. 42-10, at 35–90; ECF No. 42-11, at 118–218; ECF No. 42-12, at 84–182.

The report contained, among other things, an architectural report by Paul Daley, an architectural historian; letters from several community organizations and individuals supporting the landmark application; and a history of the families who lived in the house.  ECF No. 42-10, at 35–90; ECF No. 42-11, at 118–218; ECF No. 42-12, at 84–182.  Daley's architectural report described the house as a "fine, surviving example of the Colonial Revival" style of architecture, which, he explained, gained popularity in the early 20th Century.  ECF No. 42-11, at 125.  The historical section of the report described the lives of the house's previous occupants—the Van Tuyl, Verity, and Motschwiller families.  *Id.* at 128–173. According to the report, W. Harold Van Tuyl built the house and helped found a

lumber yard, which "supplied the lumber for many of the homes that stand in Wantagh today." *Id.* at 128.  Van Tuyl was also a pilot in the Naval Air Force during World War I.  *Id.* at 129.  His son similarly served in World War II and gave his life for our country.  *Id.* at 130.  The Van Tuyls owned the house for thirty-one years, before they sold it in 1956 to the Veritys, who founded a local barber shop.  *Id.* at 162.  Eleven years later, the Veritys sold the House to the Motschwiller family, operators of Wantagh Auto Body, "one of the oldest businesses in Wantagh."  *Id.* at 167.

The Landmarks Commission also considered a letter submitted by the plaintiff from architect Robert Ferraro, who opined that the property did not merit landmark status.  *Id.* at 220–222.  Ferraro wrote that the house had undergone a number of alterations that "negat[ed] any preservation value" and, on the whole, was "no different than hundreds and hundreds of similar homes on Long Island."  *Id.* at 221.

At the close of the second public hearing, the Landmarks Commission voted unanimously to recommend landmark designation to the Board.  ECF 42-12, at 279–81; ECF No. 41-16.  In a short, written decision, it explained:  "[T]he home exemplifies the Colonial Revival style so important a century ago; and the home has a significant historical connection to the community and Town through the families that lived there, and the early phase of suburbanization in Wantagh."  ECF No. 41-16.

On February 2, 2021, the Board held a public hearing to review the Landmarks Commission's recommendation.  ECF No. 41-18.  After hearing comments on both sides of the issue, the Board unanimously approved the recommendation and designated the property a historical landmark.  ECF No. 41-18, at 36–37; ECF No. 42-14.  On May 25, 2021, the Board adopted findings of fact further explaining its decision.  *See* ECF No. 41-19.  Those findings conclude that the house:

> uniquely exemplifies the Colonial Revival style of architecture so important a century ago, particularly during the early phase of suburbanization of the Town; that this unique home has a significant historical connection to the Wantagh community, as well as the Town as a whole, through the lives of the families who constructed this unique home, as well as those that later lived in, and made this their home, while significantly contributing to the early establishment, and then growth, of the Town and the Wantagh community.

*Id.* at 8–9.  The findings also emphasize "the role this unique historical home plays in the historical, architectural, and cultural 'streetscape' of the entire surrounding neighborhood."  *Id.* at 9.

As noted earlier, the house's landmark status restricts the plaintiff from proceeding with its original plan of demolishing the house.  It does not, however, necessarily foreclose all development on the property.  To the contrary, a declaration by the Town's Chief Plan Examiner for the Department of Buildings, Louis Carnovale, states that the property is large enough for the plaintiff to build a second house on it without the need to demolish the landmarked house.  ECF No. 42-19 ¶¶ 1, 11.  This would involve reconfiguring the subdivision and demolishing the

garage and swimming pool (as the plaintiff already planned to do), creating a building site north of the landmarked house large enough to accommodate a new house under the Town's zoning regulations. *Id* ¶ 11. According to Carnovale, however, this reconfiguration would require additional approvals: a discretionary variance from the Town's Board of Zoning Appeals to deviate below the minimum frontage requirement, a modification of the subdivision from the NCPC, and permission from the Landmarks Commission. *Id.*

The plaintiff did not apply for any of these approvals after the Board designated its property a landmark. Instead, the plaintiff filed the complaint in this case on February 10, 2021, eight days after the public hearing at which the Board voted in favor of designation. ECF No. 1.

On July 1, 2021, the Board and the Landmarks Commission moved to dismiss the complaint for failure to state a claim. ECF No. 20. I granted the motion with respect to the plaintiff's categorical takings claim against the Board and to all claims against the Landmarks Commission, and otherwise denied the motion. *See S. Nassau Bldg. Corp.*, 624 F. Supp. 3d, at 281.

## STANDARD OF REVIEW

The plaintiff and Board each move for summary judgment in their favor on the plaintiff's remaining causes of action pursuant to Federal Rule of Civil Procedure 56. *See* ECF No. 41; ECF No. 42. The court will grant a motion for summary

judgment if there is "no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether there is a genuine dispute as to a material fact, [the court must] resolve all ambiguities and draw all inferences in favor of the non-moving party." *Vincent v. The Money Store*, 736 F.3d 88, 96 (2d Cir. 2013) (citing *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012). There is no "genuine" dispute when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 192 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## DISCUSSION

The plaintiff's substantive due process, non-categorical takings, and vagueness claims remain live. The parties dispute how the legal principles governing these claims apply but agree that there are no genuine issues of material fact to be tried. ECF No. 51, at 2:13–19. Before turning to these claims, I address the Board's preliminary contention that this case must be dismissed because the plaintiff has failed to join a required party.

I.    *Joinder of Fairweather Builders, Inc.*

The Board contends that non-party Fairweather Builders, Inc. ("Fairweather") is a required party that must be joined pursuant to Rule 19(a) of the Federal Rules of Civil Procedure.  ECF No. 42-21, at 16.  According to an undisputed declaration submitted by the plaintiff, Fairweather is the plaintiff's construction arm and was authorized by the plaintiff to pursue the subdivision application on the plaintiff's behalf before the NCPC.  ECF No. 41-25 ¶¶ 8, 13.  Thus, while Fairweather was the applicant for approval of the subdivision, it has no ownership or other interest in the property at issue here.  *Id.* ¶¶ 11, 13, 21.

Rule 19(a) sets forth two categories of nonparties who must be joined if feasible.  First, joinder is required if "the court cannot accord complete relief among existing parties" without the nonparty.  Fed. R. Civ. P. 19(a)(1)(A).  Second, nonparties who "claim[] an interest relating to the subject of the action" must be joined in certain circumstances enumerated in the Rule.  *Id.* 19(a)(1)(B).

Fairweather does not fall into either category.  First, its absence does not impede complete relief.  Complete relief could be accorded to the plaintiff by annulling the landmark designation, awarding damages, or granting declaratory relief; or to the Board by dismissing the plaintiff's claims, without requiring Fairweather to do anything.  *See Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 48 (2d Cir. 1996) (finding no barrier to "complete relief" where "nothing in the district

court's statements or final judgment require[] the [nonparty] to do anything or change any of its positions."). Second, Fairweather claims no interest in the landmarked house or any other subject of this action. *See* ECF No. 41-25 ¶ 21; *see also ConnTech Dev. Co. v. Univ. of Connecticut Educ. Properties, Inc.*, 102 F.3d 677, 682 (2d Cir. 1996) ("[Rule 19(a)(1)(b)] require[s] that the absent party claim a legally protected interest relating to the subject matter of the action." (Quoting *Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1044 (9th Cir.1983)). Consequently, Rule 19(a) does not require Fairweather to be joined in this action.

II.    *Takings and Substantive Due Process – Ripeness and Finality*

Moving on to the outstanding claims, the Board renews its argument—first raised in its motion to dismiss—that the plaintiff's takings and substantive due process claims fail for lack of ripeness. ECF No. 22-15, at 11; 42-21, at 17–26. I rejected this argument at the motion to dismiss stage because the plaintiff's well-pleaded allegations established ripeness. At the summary judgment stage, however, the undisputed record shows that these claims are indeed unripe. In particular, the declaration by Louis Carnovale establishes that the plaintiff may be able to build a second house on the property notwithstanding the landmark designation. But the plaintiff has not applied to do so. Without a final decision clarifying the extent to which the landmark designation impedes the plaintiff's ability to develop its property, its takings and substantive due process claims are not ripe for adjudication.

"Ripeness is a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority. At its heart is whether [the court] would benefit from deferring initial review until the claims [it is] called on to consider have arisen in a more concrete and final form." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005) (citations omitted). Specific ripeness requirements apply in the context of land use disputes. In *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), the Supreme Court held that a takings claim "is not ripe" for adjudication until (1) "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue," and (2) the plaintiff has exhausted state remedies to receive just compensation. 473 U.S. at 186, 194–95. The Supreme Court overruled *Williamson County*'s second prong—exhaustion of state remedies—in *Knick v. Township of Scott*, 588 U.S. 180, 206 (2019). The "final decision" requirement, however, remains good law and has been expanded in this Circuit to apply to both takings and substantive due process challenges to land use regulations. *See Pakdel v. City & Cnty. of San Francisco*, 594 U.S. 474, 475 (2021) (reaffirming the "final decision" requirement); *see also Murphy*, 402 F.3d at 350 (finality requirement applies to substantive due process and takings claims (citing *Southview Assocs. v. Bongartz*, 980 F.2d 84, 97 (2d Cir. 1992))).

12

Under *Williamson County*'s finality requirement, if "avenues still remain for the government to clarify or change its decision, it is not final and therefore not ripe for judicial review." *Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344, 350 (2d Cir. 2023) (internal quotation marks omitted) (quoting *Pakdel*, 594 U.S. at 480). The rationales for the finality requirement flow from the nature of the claims to which it applies: "[B]ecause a plaintiff who asserts a [non-categorical] taking must prove that the government regulation has gone 'too far,' the court must first know how far the regulation goes." *Pakdel*, 594 U.S. at 479 (cleaned up) (quoting *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1986)). Additionally, the finality requirement ensures that the court can "determine whether a claimant was deprived of property and whether the government conduct was arbitrary or capricious"—both elements of a substantive due process claim. *Southview Assocs.*, 980 F.2d at 97.

Finality is generally conditioned on the property owner "submitting at least one meaningful application to the relevant municipal entity" for permission to develop the property. *Vill. Green At Sayville, LLC v. Town of Islip*, 43 F.4th 287, 296 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Murphy*, 402 F.3d at 348). This is because "it is 'virtually impossible' for [the court] to determine what development will be permitted on a particular lot of land when its use is subject to the decision of a regulatory body invested with great discretion, which it has not yet

even been asked to exercise." *Id.* (cleaned up) (quoting *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 739 (1997)).  While the requirement is "relatively modest" and demands only "*de facto* finality," a decision is not final unless it leaves "no question about how the regulations at issue apply to the particular land in question." *Pakdel*, 594 U.S. at 478–79 (internal quotation marks omitted) (quoting *Suitum*, 520 U.S. at 739).

A plaintiff need not "submit a plan for development of his property . . . [when] such a submission would [be] pointless." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1012 n.3 (1992) (cleaned up) (quotation marks and citations omitted).  This exception means that a plaintiff need not apply for an approval when, for example, an agency "lacks discretion to grant [the application] or has dug in its heels and made clear that all such applications will be denied." *Murphy*, 402 F.3d at 349.

In denying the Board's motion to dismiss for lack of ripeness, I concluded that the plaintiff's well-pleaded allegations, accepted as true, plausibly established the futility exception to the ordinary requirement to submit one meaningful application. *S. Nassau Bldg. Corp.*, 624 F. Supp. 3d at 271.  Based on the plaintiff's submissions, I found that "the [h]ouse straddles the center of the property in a way that prevents plaintiff from building a second house."  *Id.*  Because the "goal of the landmark designation was to assure the preservation of the [h]ouse at its current location," and against the backdrop of the extensive process undertaken to landmark the property,

14

I concluded that any application to develop a two-lot subdivision on the property would be futile. *Id.*

At the summary judgment stage, however, I must consider the undisputed facts in the record, which include the declaration by Louis Carnovale, the Town's Chief Plan Examiner for the Department of Buildings. *See* ECF No. 42-19. Carnovale's declaration states that the plaintiff's property is large enough to accommodate two building lots of sufficient size under the applicable zoning regulations without demolishing or moving the existing house. *Id.* ¶ 11. This could be done by reconfiguring the subdivision into two lots separated by a property line running roughly east to west, rather than north to south as the current subdivision is configured. *Id.* The landmarked house would occupy the lot to the south of the new property line, while the lot to the north would be large enough to accommodate the construction of a second house—albeit, requiring the removal of the garage and pool that currently occupy that area.[2] *Id.* The plaintiff has not contested the facts set out

---

[2] The plaintiff's property is within the Town's Residence "A" Zoning District, which permits building lots with a minimum lot area of 6,000 square feet. ECF No. 42-22 ¶¶ 9–10; ECF No. 42-19 ¶ 6; *see also* Hempstead, N.Y., Bldg. Zone Ordinance § 29. Carnovale's declaration states that a 6,300 square-foot building lot could be carved out of the property to the north of the house. ECF No. 42-19 ¶ 11. Subtracting that lot area from the property's total square footage indicates that the lot to the south containing the landmarked house would be approximately 13,700 square feet. *See* ECF No. 42-22 ¶ 6.

in Carnovale's declaration.  Accordingly, there is no dispute that the current location of the landmarked house does not necessarily foreclose building a second house.

That is not to say that the plaintiff is guaranteed approval of the development Carnovale proposes.  The Board concedes that building a second house on a reconfigured north lot would require permission from several bodies, some of which wield considerable discretion.  First, the plaintiff would need approval from the NCPC to reconfigure the subdivision.  *See* Nassau Cnty. Charter § 1610(a)(13) (defining "subdivision" to include "any alteration of" approved and duly filed "lot lines or dimensions of any lots or sites.").  Additionally, the reconfigured north lot's frontage onto Jones Avenue would be twelve feet less than the zone's 60-foot minimum, requiring a variance from the Town's Board of Zoning Appeals ("BZA"). ECF No. 42-19 ¶ 11; *see also* Hempstead, N.Y., Bldg. Zone Ordinance § 29. Carnovale's declaration states that construction would also require approval from the Landmarks Commission.  ECF No. 42-19 ¶ 11; *see also* Hempstead, N.Y., Code § 76-10 (requiring Landmarks Commission "review" of "plans for the . . . alteration . . . of places, sites, structures, or buildings designated as sites.").

Nevertheless, Carnovale's declaration shows that it is "possib[le] . . . that 'some development will be permitted'" on the property, in addition to the existing house.  *See Southview Assocs.*, 980 F.2d at 98 (quoting *Macdonald, Sommer & Frates*, 477 U.S. at 352).  Indeed, building a second house without demolishing or

moving the existing house would be consistent with the Board's goal of preserving the existing house and maintaining the neighborhood's "streetscape."  ECF No. 42-15 at 9, 12.  Though discretionary, the plaintiff has not disputed that the approvals needed to develop a two-lot subdivision are within the power of the relevant bodies to grant.

Because the plaintiff has not submitted at least one application to develop its property, the court cannot ascertain "whether the [Town will] deny approval for all uses that would enable the plaintiff[] to derive economic benefit from the property." *Southview Assocs.*, 980 F.2d at 98 (internal quotation marks omitted) (quoting *Williamson Cnty. Reg'l Plan. Comm'n*, 473 U.S. at 187).  As the Supreme Court has explained, "local agencies charged with administering regulations governing property development are singularly flexible institutions; what they take with the one hand they may give back with the other." *MacDonald, Sommer & Frates*, 477 U.S. at 350.  Had the plaintiff applied to develop its property, the municipal bodies involved may have indicated the extent to which they would allow development alongside the existing house.  Even if they ultimately withheld their approval, their decision would refine the issues for the court to address in resolving the plaintiff's claims.  By proceeding straight to litigation, the plaintiff bypassed the "give-and-take negotiation that often resolves land use problems." *Vill. Green At Sayville*, 43 F.4th at 297.  The court is thus left to guess at how the landmark designation

"appli[es] to the particular land in question" because "avenues still remain for the government to clarify" what development will be permitted—in particular, whether the Board would allow development along the lines described in Carnovale's declaration. *Pakdel*, 594 U.S. at 478, 480.

The plaintiff does not directly address the significance of Carnovale's declaration to the ripeness inquiry.[3]  It notes, however, that Carnovale's proposed reconfiguration would require "at least one variance from the" BZA.  ECF No. 41-24 at 21.  But the plaintiff does not contend that the BZA "lacks discretion to grant variances" or that that applying for a variance would otherwise be futile.  *See Murphy*, 402 F.3d at 349.  The discretionary nature of the relief alone does not excuse the plaintiff from the general rule that a landowner must submit "at least one meaningful application for a variance" before suing.  *E.g., Murphy*, 402 F.3d at 348; *Vill. Green At Sayville*, 43 F.4th at 296.

Nor is finality established simply because Carnovale's proposed reconfiguration would require the approvals of multiple entities—namely, the BZA,

---

[3] The plaintiff's reply brief states that the "legal relevance of Carnovale's development suggestion is not apparent."  ECF No. 41-24 at 21.  However, the Board's opening brief—while not a model of clarity—clearly cited Carnovale's declaration to support its argument that *Williamson County* ripeness was absent.  The Board invoked the declaration in its discussion of ripeness and argued: "[T]he landmark designation not withstanding [sic], with variances the [p]laintiff may conceivably develop a two-lot subdivision without destroying or moving the Van Tuyl house."  ECF No. 41-23 at 26.

NCPC, and Landmarks Commission.  Indeed, *Williamson County* itself presented similar circumstances.  There, the Supreme Court held that the County Planning Commission's rejection of a proposal to develop the plaintiff's property was not a "final decision" because the plaintiff had not sought "variances from *either* the Board [of Zoning Appeals] *or* the [Planning] Commission," each of which had the power to grant certain of the variances needed.  *Williamson Cnty. Reg'l Plan. Comm'n*, 473 U.S. at 188 (emphasis added).  Similarly, in *BMG Monroe I, LLC v. Village of Monroe*, 93 F.4th 595 (2d Cir. 2024), the Second Circuit held that a property owner's failure to seek variances from either of two agencies empowered to grant relief from applicable architectural requirements rendered its claims unripe. 93 F.4th at 603.  The court explained, "even if futility excused [the property owner]'s failure to seek a variance from the [Zoning Board of Appeals], it would not excuse [it]'s failure to seek a second variance from *the Village Planning Board*."  *Id.* at 604 n.6.  As in *Williamson County* and *BMG Monroe I*, the plaintiff here is not excused from applying to develop its property simply because it must seek approvals from more than one agency.

The plaintiff next contends that Carnovale's proposed reconfiguration would require the plaintiff to "scrap its approved subdivision and start over with a new plan" that would involve selling "the century-old [h]ouse" on the south lot "instead of a newly constructed dwelling designed to modern living sensibilities."  ECF No.

19

41-24 at 21.  As an initial matter, the Ordinance only restricts the alteration of exterior building features; the plaintiff remains free to renovate the house's interior without approval from the Landmarks Commission.  *See* Hempstead, N.Y., Code § 76-10(D).  More importantly, the Takings Clause does not guaranty a property owner the "*most* beneficial use of the[ir] property."  *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 127 (1978) (emphasis added) (citing *Goldblatt v. Hempstead*, 369 U.S. 590, 592 (1962)).  Accordingly, a decision is not final simply because it makes clear that the municipality would reject the property owner's *preferred* development plan.

To the contrary, courts have routinely held that a rejection of one plan is not "final" if it remains possible that the municipality would approve a *different* plan— typically, one that responds to the municipality's initial concerns.  *See, e.g.*, *Macdonald, Sommer & Frates*, 477 U.S. at 351–53, 351 n.8 (finding no finality where planning commission rejected "only one intense type of residential development" but it remained "possibl[e] that some development will be permitted"); *cf. Penn Cent. Transp. Co.*, 438 U.S. at 136–37 (finding no regulatory taking because plaintiff had "not sought approval for . . . a smaller structure" than its proposed 50-plus story office tower).  The Second Circuit's decision in *Southview Associates, Ltd. v. Bongartz*, demonstrates this principle:  There, the court held that the Vermont Environmental Board's denial of a subdivision proposal was not "final"

because the developer had not sought "a permit for a subdivision situated on *another part* of its property." 980 F.2d at 98–99 (emphasis added). Despite the Board's rejection of "one particular subdivision approval," the court found that the Board "would be receptive to a subdivision proposal that placed lots in a different segment of the . . . property so as to minimize impact on" deer habitat. *Id.* at 99. The developer had not pursued a reconfigured proposal; so, it remained unclear what development the Board would permit. *Id.* Consequently, the developer's takings and substantive due process claims were unripe. *Id.*

So too here: The plaintiff is asking the court to intervene before the relevant municipal entities have weighed in on whether the plaintiff can build a second house on a different part of its property. While the plaintiff would clearly prefer to build *two* new houses, it has "not [shown] that *only* [development] along the lines of its [original plan] would avert a regulatory taking." *See MacDonald, Sommer & Frates*, 477 U.S. at 351 n.8 (emphasis added). To the contrary, the plan described in Carnovale's declaration would allow the plaintiff to develop and sell two houses on two separate building lots, providing a beneficial use of both lots. Moreover, the record does not indicate that the relevant municipal entities would be unreceptive to a development plan that preserves the existing house at its current location.

In sum, the plaintiff has not obtained a final decision clarifying the extent of development that will be permitted on its property. While the Landmarks

Commission seems likely to reject the original plan involving the demolition of the landmarked house, the plaintiff's failure to pursue any other plan despite the existence of a possible alternative configuration "leaves undetermined the permitted use of the property in question." *BMG Monroe I, LLC*, 93 F.4th at 601 (internal quotation marks omitted) (quoting *Murphy*, 402 F.3d at 353). Accordingly, the plaintiff's non-categorical takings and substantive due process claims are unripe. As to both, the Board's motion for summary judgment is granted, and the plaintiff's motion denied.[4]

III.    *Vagueness*

The plaintiff's remaining cause of action challenges the Ordinance as unconstitutionally vague. The Ordinance, however, is sufficiently definite as applied to the plaintiff's property to pass constitutional muster.

A. *The Vagueness Doctrine*

Among the "most fundamental protections of the Due Process Clause" is the requirement that "laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (cleaned up) (citations omitted). A statute may be

---

[4] Because I resolve both claims on their lack of *Williamson County* ripeness, I do not reach the merits of either.

unconstitutionally vague on either of two grounds: "[f]irst, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56–57.  Plaintiff's challenge to the Ordinance is premised on the second ground.  Under this aspect of the vagueness doctrine, "[a] regulation will encounter valid vagueness objection if it accords 'unfettered discretion' to those who enforce it." *Hayes v. New York Att'y Grievance Comm. of the Eighth Jud. Dist.*, 672 F.3d 158, 169 (2d Cir. 2012) (quoting *Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir. 1999)).

"The degree of vagueness tolerated in a statute varies with its type: economic regulations are subject to a relaxed vagueness test, laws with criminal penalties to a stricter one, and laws that might infringe constitutional rights to the strictest of all." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008)).  The Ordinance at issue here is a civil statute and, as such, is not impermissibly vague unless its commands are "so vague and indefinite as really to be no rule or standard at all." *Ass'n of Int'l Auto. Mfrs., Inc. v. Abrams*, 84 F.3d 602, 614 (2d Cir. 1996) (internal quotation marks omitted) (quoting *Boutilier v. Immigr. & Naturalization Serv.*, 387 U.S. 118 (1967)).

In reviewing an ordinance for vagueness, "we are relegated to the words of the ordinance itself, to the interpretations [state courts have] given to analogous statutes, and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (cleaned up) (citation omitted). Neither "mathematical certainty" nor "meticulous specificity" is required. *Id.* (citation omitted). Rather, because "language is necessarily marked by a degree of imprecision," *Thibodeau*, 486 F.3d at 66, statutory text may reflect "flexibility and reasonable breadth" without running afoul of due process, *Grayned*, 408 U.S. at 110.

The plaintiff mounts both facial and as-applied vagueness challenges to the Ordinance. "A facial challenge is an attack on a statute itself as opposed to a particular application." *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015). By contrast, in an as-applied challenge, an ordinance's vagueness is assessed "in light of the specific facts of the case at hand." *United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) (citation omitted). "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 130 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494–95 (1982)). Thus, courts "evaluate '[v]agueness challenges to statutes not threatening First Amendment interests' . . . only 'on an as-applied basis.'" *United States v. Requena*, 980 F.3d 30, 40 (2d Cir. 2020) (quoting

*Maynard v. Cartwright*, 486 U.S. 356, 361 (1988)).  Because the plaintiff does not contend that the Ordinance threatens First Amendment interests, only its as-applied vagueness challenge is viable.

### B.  *Vagueness As-Applied*

Assessing the sufficiency of an ordinance's enforcement standards in an as-applied challenge involves two steps.  First, the court asks whether the "statute as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement."  *VIP of Berlin, LLC*, 593 F.3d at 191 (internal quotation marks omitted) (quoting *Farrell v. Burke*, 449 F3.d 470, 494 (2d Cir. 2006)).  Second, "even in the absence of such standards," the court may reject a vagueness challenge if "the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute."  *Id.* (quoting *Farrell*, 449 F3.d at 494 (2d Cir. 2006)).  Here, the inquiry starts and ends at the first step because the Ordinance sets forth sufficiently clear standards to curb arbitrary enforcement as a general matter.

To determine whether the Ordinance provides generally clear enforcement standards, I begin with "the words of the ordinance itself."  *Grayned*, 408 U.S. at 110.  Two of its provisions speak to the standard for designating a landmark.  Most directly, Section 76-1 of the Town Code defines a landmark as "[a]ny place, structure

or building of historical value or aesthetic interest by reason of its antiquity or uniqueness of architectural design or as part of the development, heritage or cultural characteristics of the town, county, state or nation." Hempstead, N.Y., Code § 76-1. In addition, Section 76-6(A) delineates the factors the Landmarks Commission must consider, to the extent applicable, in recommending a landmark application to the Board. These factors are "the special character, ambiance, historical significance, aesthetic value and uniqueness of architectural design of the proposed landmark." *Id* § 76-6(A).

As is obvious, both provisions leave ample room for the Board and Landmarks Commission to exercise discretion in deciding landmark applications. The Ordinance does not define "historical value," "aesthetic interest," "uniqueness," or "antiquity." Indeed, each of these concepts is partly subjective. Such "flexibility and reasonable breadth," however, does not necessarily violate due process. *Grayned*, 408 U.S. at 110.

To the contrary, courts have generally held that concepts like cultural significance, historical value, and aesthetic interest have common sense meanings that can be applied in a reasonably objective manner. *See, e.g., Maher v. City of New Orleans*, 516 F.2d 1051, 1061–63 (5th Cir. 1975) (rejecting claim that historic districting ordinance lacked sufficient enforcement standards); *Kruse v. Town of Castle Rock*, 192 P.3d 591, 599 (Colo. App. 2008) ("[Historic preservation]

ordinances must contain broad terms to permit application to different potentially historic properties."). *But cf. Anderson v. City of Issaquah*, 851 P.2d 744, 747, 751–52 (Wash. Ct. App. 1993) (holding that building design ordinance prescribing, *inter alia*, "harmonious" colors, "appropriate proportions," and "complimentary details" was unconstitutionally vague, as-applied). Indeed, as the Second Circuit has explained, it is "doubt[ful] that a municipality could maintain a reasonable level of architectural homogeneity or historical fidelity—both of which are proper governmental purposes—in the absence of judgments that are partly subjective." *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 495 (2d Cir. 2007).

In fact, several courts have rejected vagueness challenges to historic preservation ordinances similar in some respects to the Ordinance. For example, in *Chabad Lubavitch of Litchfield County, Inc. v. Borough of Litchfield*, 853 F. Supp. 2d 214 (D. Conn. 2012), the district court rejected a vagueness challenge to an ordinance governing the use of buildings located in a historic district. 853 F. Supp. 2d at 234–35. The ordinance required the Borough's historic district commission to consider several factors before permitting proposed uses, including the building's "historical and architectural value and significance," as well as its "architectural style, scale, general design, arrangement, texture and material and the relationship thereof to . . . other buildings and structures in the immediate neighborhood." *Id.* at 233–34 (quoting Conn. Gen. Stat. § 7-147f). The district court explained that, while

"some of these criteria are subjective, they are sufficiently tied to objective aesthetic standards to provide necessary guidance to the [commission] such that the [c]ommission is not vested with unbridled discretion."[5]  *Id.* at 234–35.

Similarly, *Rector, Wardens, & Members of the Vestry of St. Bartholomew's Church v. City of New York* ("*St. Bartholomew's*"), 728 F. Supp. 958 (S.D.N.Y. 1989), rejected a facial vagueness challenge to New York City's landmarks preservation ordinance.  728 F. Supp. at 964.  In terms similar to the Ordinance here, New York City's ordinance defined a "landmark" as:

> [a]ny improvement, any part of which is thirty years old or older, which has a special character or special historical or aesthetic interest or value as part of the development, heritage or cultural characteristics of the city, state or nation, and which has been designated as a landmark pursuant to the provisions of this chapter.

N.Y.C., Admin. Code § 25-302(n) (1989).  The district court held that the ordinance "unquestionably" satisfied due process because it "provide[d] a property owner with adequate notice of the law's requirements and the opportunity for an extensive hearing."  728 F. Supp. at 964.  "[S]ince a reasonable person can and should know what standards must be met in . . . opposing a landmark designation," the court

---

[5] On appeal, the Second Circuit affirmed the district court's decision in relevant part, although only on the ground that the plaintiff waived the issue of vagueness due to insufficient briefing on appeal, and vacated on other grounds. *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 200 (2d Cir. 2014).

concluded that the ordinance was "not impermissibly vague."[6]  *Id.*  While analogous to this case in many regards, *St. Bartholomew's* is distinct in two ways.  First, it resolved a facial, rather than as-applied, vagueness challenge.  *Id.* at 962.  Second, the decision analyzed only whether the ordinance gave adequate notice of its requirements—not whether the ordinance authorized or encouraged arbitrary and discriminatory enforcement.  *See id.* at 964.  In other words, the court did not address the ground for vagueness advanced by the plaintiff here.[7]  Nevertheless, *St. Batholomew's* is one among a chorus of decisions holding that concepts like "historical or aesthetic interest"—which are core to historic preservation statutes— are sufficiently concrete to pass constitutional muster.

In accordance with these decisions, the factors set forth in the Ordinance for designating a landmark are clear enough to curb arbitrary and discriminatory enforcement.  "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the [standard] it establishes has been proved; but rather the indeterminacy of precisely what that [standard] is."  *United*

---

[6] On appeal, the plaintiff did not renew its vagueness challenge and instead pursued only free exercise and takings claims.  *See Rector, Wardens, & Members of Vestry of St. Bartholomew's Church v. City of New York*, 914 F.2d 348, 353 (2d Cir. 1990).

[7] This may be because *St. Bartholomew's* pre-dates much of the caselaw elaborating the two distinct aspects of the vagueness doctrine.  *See, e.g., Hill v. Colorado*, 530 U.S. 703, 732 (2000); *Farrell v. Burke*, 449 F.3d 470, 784–85 (2d Cir. 2006).

*States v. Williams*, 553 U.S. 285, 306 (2008).  Here, there is no question what the Ordinance requires:  To be eligible for landmarking, a building must have "historical or aesthetic interest," and that interest must be tied to "its antiquity or uniqueness of architectural design" or to its connection with "the development, heritage or cultural characteristics of the town, county, state or nation."  Hempstead, N.Y., Code § 76-1.  The factors set out in § 76-6(A) further guide the Landmarks Commission in determining whether a building meets this standard—and by extension the Board in acting on the Commission's recommendation.  While these terms are partly subjective, they have common sense meanings that—like other historic preservation statutes—adequately cabin the discretion of the Board and Landmarks Commission.

Moreover, New York law provides additional protection by authorizing individuals to challenge local agency action on the ground that it was arbitrary and capricious or an abuse of discretion.  *See* N.Y. C.P.L.R. art. 78 (McKinney 2025); *id.* § 7803(3).  This procedure, known as an Article 78 proceeding, can be used to challenge a landmark designation affecting the challenger's property.  *See, e.g., 989 Hempstead Tpk., LLC v. Town Bd. of Hempstead*, 187 N.Y.S.3d 662, 664 (App. Div. 2023); *Stahl York Ave. Co., LLC v. City of New York*, 905 N.Y.S.2d 37, 40 (App. Div. 2010).  For example, in *Paloma Homes, Inc. v. Petrone*, 781 N.Y.S.2d 675 (App. Div. 2004), Article 78 was used to obtain an order annulling a landmark designation of the petitioner's property where the town board had failed to set forth "specific

findings of fact to support its determination." 781 N.Y.S.2d at 677. This opportunity under state law for judicial review of local agency action significantly weakens the plaintiff's contention that the Ordinance does not "as a general matter . . . eliminate the risk of arbitrary enforcement." *VIP of Berlin, LLC*, 593 F.3d at 191 (citation omitted).

The plaintiff contends, however, that the Board's interpretation of the Ordinance in this particular case was unconstitutionally vague because it allowed the Board to essentially ignore the Ordinance's text. We may look to "the interpretation of the statute given by those charged with enforcing it" in reviewing an as-applied vagueness challenge. *Grayned*, 408 U.S. at 110 (cleaned up) (citation omitted).

The plaintiff points to the Board's findings of fact supporting its decision to landmark the plaintiff's property. *See* Pl's. Ex. Q, ECF No. 41-19. There, the Board summarized the record and recited the relevant law it considered in granting the landmark application. *Id.* It explained that it considered "the standards articulated in the controlling ordinance" and the factors "set forth in §76-6A of the Town Code," "*as well as such factors deemed relevant by the Board*." *Id.* at 8 (emphasis added). In a footnote to this final clause, it cited two New York Court of Appeals decisions—*Cummings v. Town Board of North Castle*, 466 N.E.2d 147 (N.Y. App. Div. 1984), and *Buitenkant v. Robohm*, 505 N.Y.S.2d 884 (App. Div. 1986)—which held:

31

> Where a legislative body such as a town board reserves to itself the power to grant special use permits, *it need not set forth any standards to govern the exercise of its discretion*. The only limitation upon this exercise of discretion is that it must not be arbitrary or capricious.

*Buitenkant*, 505 N.Y.S.2d at 885 (emphasis added) (citation omitted); *see also Cummings*, 466 N.E.2d at 148 ("When the legislative body reserves to itself the granting of special exceptions it need set forth no standards for the exercise of its discretion . . . ."). The Board has also cited *Buitenkant* and *Cummings* in its briefing to this Court, where it has claimed to have "untrammeled, but of course not capricious discretion" to designate landmarks and contended that it "is guided, but not constrained by" the § 76-6(A) factors that govern the Landmarks Commission's review of a landmark application. ECF No. 41-23, at 57–58 (internal quotation marks omitted) (quoting *Cummings*, 466 N.E.2d at 148).

The plaintiff contends that this asserted authority to deem additional factors to be relevant to the Board's decision allows the Board to ignore the Ordinance's text and designate landmarks based on "unknown factors at its whim." ECF No. 41-22, at 18–19. Moreover, it contends that *Buitenkant* and *Cummings* apply in the context of special use permits—not landmark designations, which must be made in accordance with statutory standards. *Id.* at 20 (citing *Paloma Homes, Inc.*, 781 N.Y.S.2d at 676–67). Thus, the Board's claim of "untrammeled" discretion to designate landmarks reveals the absence of clear enforcement standards governing its application of the Ordinance to the plaintiff's property.

32

While it is a close question, the Board's decision, taken as a whole, does not support the plaintiff's contention that the Board interpreted the Ordinance to permit the use of extra-statutory considerations in designating the plaintiff's property a landmark. Rather, further review of the Board's decision indicates that it was based on the Board's judgment—reasonable or not—about the house's aesthetic and architectural value and its connection to Hempstead's history. *See* Hempstead, N.Y., Code § 76-1. For example, the Board's findings of fact emphasized the house's "graceful, classically inspired symmetry," which in its view "exemplifies the Colonial Revival Style." ECF No. 41-19, at 10. The Board also found that the house's "style, size, and date of construction" typify the era "when Wantagh made the transition to suburban community," making the house an "historical, architectural, and cultural anchor of" the neighborhood. *Id.* at 10–12. It also noted the contributions to the community and nation of various individuals who have lived in the house: W. Harold Van Tuyl supplied materials for homes in the area through his lumber business and served as a flyer in World War I; his son, Richard Van Tuyl, flew in World War II and was shot down over enemy territory; and the Motschwiller family, who most recently occupied the house, operated a business in one of Wantagh's historic buildings. *Id.* at 9–11.

Agree with the Board's decision or not, it was—as the Ordinance requires—grounded in the Board's judgment about the house's "historical, architectural, or

cultural significance to the local community." *Id.* at 13; *see also* Hempstead, N.Y., Code § 76-6(A).  As I explained in my order of August 17, 2022, aspects of the record undermine the Board's rationale to some extent.  For example, the Board's findings repeatedly emphasized the house's uniqueness. *See S. Nassau Bldg. Corp.*, 624 F. Supp. 3d at 268–69.  Yet the applicant's own expert, Paul Daley, wrote that "revival styled homes [still] remain on both Elm Place and Jones Avenue."  ECF No. 42-11 at 127.  And the Board itself stated that "the Colonial Revival style found fertile ground in the Town of Hempstead."  ECF No. 41-19 at 10.  Nevertheless, the relevant point for purposes of the vagueness inquiry is that it is clear *what* standard the Board was applying.  Whether its application of that standard was arbitrary and capricious or an abuse of discretion is a question an Article 78 proceeding might have resolved.  The plaintiff did not pursue such review.

Because the Ordinance, as-applied to the plaintiff's property, provides "sufficiently clear standards to eliminate the risk of arbitrary enforcement," I need not consider whether the property at issue falls within the Ordinance's "core." *VIP of Berlin, LLC*, 593 F.3d at 191.  The plaintiff's claim that the Ordinance is unconstitutionally vague as-applied falls short at the first step of the inquiry.  The Board is therefore entitled to summary judgment on the plaintiff's vagueness claim.

## CONCLUSION

The Board's motion for summary judgment is granted as to all remaining causes of action in the complaint, and the plaintiff's motion for summary judgment is denied.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York                    Edward R. Korman
September 24, 2025                     United States District Judge